BERTHA TIMMONS, RESPONDENT, v. ST. LOUIS-SAN FRANCISCO RAIL-WAY CO., J. M. KURN AND JOHN G. LONSDALE, APPELLANTS.—100 S. W. (2d) 952.

Kansas City Court of Appeals.   December 7, 1936.

*C. R. Leslie, R. D. Johnson* and *Hume & Raymond* for respondent.

*Joseph W. Jamison, Henry S. Conrad, L. E. Durham, Hale Houts* and *I. M. Lee* for appellants.

BLAND, J.—This is an action for damages for personal injuries. Plaintiff recovered a verdict and judgment in the sum of $4600. Defendants have appealed.

The facts show that plaintiff received an injury on January 14, 1935, while riding as a passenger on a train being operated by the appellants when the train came into collision with a truck belonging to the Rairdon Transfer & Warehouse Company.

The suit was instituted against the St. Louis-San Francisco Railway Company and J. M. Kurn and John G. Lonsdale, as trustees of said company, the trustees of the Missouri Pacific Railroad Company and the Rairdon Transfer & Warehouse Company. The suit was filed on March 30, 1935. However, on July 5, 1935, plaintiff made a settlement with the Rairdon Transfer & Warehouse Company for $600 and on July 12th of that year dismissed the suit as to that company. At the close of plaintiff's evidence, she took an involuntary nonsuit as to the trustees of the Missouri Pacific Railroad Company and at the close of all of the evidence dismissed as to the St. Louis-San Francisco Railway Company, leaving as the sole and only defendants, the appellants, J. M. Kurn and John G. Lonsdale, trustees of the St. Louis-San Francisco Railway Company. (Hereafter referred to as the defendants.)

The collison occurred where defendants' tracks cross 37th Street in Kansas City. Thirty-seventh Street, at the point in question, is

also United States Highway number 40. It runs east and west and has four track lanes, two lanes on the south half of the pavement for eastbound traffic and two lanes on the north half for westbound traffic. The St. Louis-San Francisco Railway Company, now being operated by said trustees, crosses the highway from the southwest to the northeast at a slight angle. East of, and running parallel with, this track are four tracks of the Missouri Pacific Railroad Company, being numbered from west to east one, two, three and four. The highway is eighty feet wide from property line to property line and fifty-eight feet wide between the curbs of the street. The distance between defendants' track and Missouri Pacific Railroad Company track No. One, measured from center to center, is thirty-nine feet, between Missouri Pacific Tracks Nos. One and Two, thirteen feet, six inches, between Missouri Pacific Tracks Nos. Two and Three, thirteen feet, six inches and between Missouri Pacific Tracks Nos. Three and Four, fourteen feet, five inches.

The train upon which plaintiff was a passenger consisted of two cars drawn by a gas and electric motor. The train was going northwardly and the truck toward the west. The collision occurred about 4:30 P. M. The train, of course, was running over the track of the St. Louis-San Francisco Railway Company, which was the track farthest west. The truck was being driven along the extreme north side of 37th Street. Just prior to the collision a Missouri Pacific freight train was standing on Track No. Two of that company and over the street, blocking the crossing. During this time the truck of the Rairdon Transfer & Warehouse Company, and other westbound motor vehicles, stood on the east side of the Missouri Pacific tracks for a period of five or ten minutes, or until the crossing was cleared. The train was finally cut in two at a point, estimated by some of plaintiff's witnesses, as immediately south of the south edge of 37th Street and others as being fifty feet south of the crossing, and by defendants' witnesses as being at a point four car lengths south of the south side of 37th Street. However, after the train was cut it pulled on toward the north leaving a string of box cars standing south of 37th Street. The Missouri Pacific trainman, who cut the train in question, after doing so, proceeded to the north side of 37th Street and motioned for the traffic to proceed across the track. Whereupon the vehicular traffic bound in both directions started up, including the truck of the Rairdon Transfer & Warehouse Company. This truck, according to the testimony of some of the witnesses, was moving at the rate of two and one-half to three miles per hour. There were two or three vehicles in front of the Rairdon truck that got across the track of the defendants in safety, but defendants' train struck the Rairdon truck to the rear of the cab of the latter and shoved it northwardly and off of the track toward the east, the train stopping with its rear end about 100 yards north of the north side of the street. Plaintiff was injured

by being thrown by the force of the collision against the seat in which she was sitting.

As against the present defendants, the petition alleges general negligence and plaintiff sought to rely upon the doctrine of *res ipsa loquitur*. However, defendants insist that plaintiff is not entitled to rely on that doctrine and, consequently, the court erred in giving plaintiff's instruction No. One, submitting general negligence. Defendants say that plaintiff's evidence tended to prove specific acts of negligence, disclosing specifically the cause of the collision and, having shown exactly how the collision occurred, there is no room for the application of the doctrine of *res ipsa lquitur*. This will require a statement of the evidence more in detail.

Plaintiff sought to prove, and there is little contention but that she succeeded in introducing evidence tending to prove, that defendants were negligent in the following particulars: To use plaintiff's words: "Failure of the crossing bells to work; failure of the crossing lights to work; failure of Defendants' engineer to keep a proper lookout; failure of Defendants' engineer to make timely application of the brakes; failure to ring the bell on the train; failure to maintain a watchman at the crossing to direct the traffic; failure of the train to blow the whistle; excessive speed of the train through the heavy traffic of this crossing."

As before stated, United States Highway No. 40 and 37th Street are identical at the place of the collision. The evidence shows that Highway No. 40 is one of the most densely traveled trafficways out of Kansas City, the point of the collision being near the edge of said city; that not only traffic to various suburban towns and cities use this highway but that there are a number of industrial plants located in the vicinity of the crossing, two of which are the Chevrolet Motor Car Company plant and the Fisher Body plant, situated a short distance east of the crossing. These plants employed approximately 2000 workmen, 1200 of whom had automobiles. The automobiles of the workmen were parked along both sides of 37th Street on each side of the crossing as well as on two parking lots near these plants on the east side of the crossing. The traffic over the crossing was particularly dense at the time of the collision, 4:30 P. M., as workmen from the two plants mentioned were going home about that time. One witness testified that during the time that the crossing was blocked by the Missouri Pacific freight train motor vehicles waiting to cross the tracks were backed up east of the crossing down to the Jack Cooper Transfer offices, which was between 150 and 160 feet. The driver of the Rairdon Transfer & Warehouse Company truck testified that motor vehicle were backed up to the Chevrolet plant. There is also evidence of a number of vehicles waiting on the side of the tracks and headed toward the east.

There is no dispute in the testimony but that the crossing in question was one greatly in use at the time of the collision and that vehicles headed in each direction stood upon both sides of the tracks waiting for the train of cars on the Missouri Pacific tracks to be moved off of the crossing.

The engineer had been in the service of the defendants, and running trains over the crossing in question, for twenty-eight years and, of course, knew, even without looking, of the density of the traffic likely to be found there at the time of day in question. Notwithstanding this, the evidence shows that he approached the crossing going at the rate of speed of forty-five miles per hour and did not slacken the speed of the train until the collision. There is some dispute in the evidence as to the visibility toward the south of both the engineer and the drivers of westbound vehicles, in view of the presence of the box cars upon the Missouri Pacific track. However, one of defendants' witnesses testified that the engineer had a clear view toward the crossing when he arrived at a place 1000 or 1300 feet south thereof, the track being straight and, in the opinion of the witness, the engineer could have seen the traffic blocked up at the crossing ready to go over it as he approached that place. In fact, the engineer testified that he saw the Rairdon truck when it was somewhere near the west rail of the first Missouri Pacific track; that at that time the train was between seventy-five and one hundred feet from the crossing; that he saw cars on the west side of the tracks of the St. Louis-San Francisco Railway Company when he was at the whistling post 1320 feet away; that for a distance of 200 feet before reaching the crossing he could see motor vehicles at the Chevrolet pant.

The train was not equipped with a whistle but a horn, referred to by some of the witnesses as a whistle. It also had a bell which, the engineer testified, was automatically ringing all of the time. However, some of plaintiff's witnesses testified that they heard no bell, horn or whistle. However, one of them testified that he heard the horn sounded.

The evidence shows that there are four bells and red lights at each corner of the intersection located on poles about eight feet above the ground; that there is also a light on the poles with the word "stop." These lights and bells may be operated automatically through the tracks or manually by a man stationed in the tower which is located between the tracks of the Missouri Pacific Railroad Company and defendants' and about sixteen feet, ten inches above the ground. These lights and bells, as a rule operate automatically and begin to ring and flash when a train approaches the crossing. However, when there is switching in the vicinity and a train stands for some length of time near the crossing the tower man cuts off the lights and bells so that they cease to operate automatically.

Defendants' evidence shows that these lights and bells were operating at the time of the collision. Plaintiff's evidence tends to show to the contrary. The evidence is undisputed that no watchman was located at the crossing. Defendants' evidence tends to show that the horn on the train was being intermittently and properly sounded; that the bell on the train was ringing constantly; that the crossing lights were flashing and the crossing bells ringing during all of the time that the driver of the Rairdon truck was approaching the point of the collision.

Defendants introduced in evidence that part of plaintiff's petition alleging negligence as against the Rairdon Transfer & Warehouse Company, such negligence being that the driver of the truck failed to stop, look and listen.

It is well settled that a plaintiff is not deprived of the right to go to the jury on the *res ipsa loquitur* theory merely because he introduces some proofs of specific acts of negligence on the part of the defendant. In this connection, the Supreme Court stated in the case of Price v. Met. St. Ry. Co., 220 Mo. 435, 456, 457:

"In so doing she assumed a burden that she did not have to assume in making out a *prima-facie* case, but it does not lose her the right of resting upon the presumption, if the evidence so introduced does not clearly show what did cause the accident. The rule is well stated by the Supreme Court of Massachusetts, in Cassady v. Old Colony Street Railway Co., 32 Am. & Eng. R. R. Cases (N. S.), 1. c. 671: 'The defendant also contends that even if ordinarily the doctrine would have been applicable, the plaintiff had lost or waived her rights under that doctrine, because, instead of resting her case solely upon it, she undertook to go further, and show particularly the cause of the accident. This position is not tenable. It is true that, where the evidence shows the precise cause of the accident, as in Winship v. Railroad, 170 Mass. 464, 49 N. E. 647, and Buckland v. Railroad, 181 Mass. 3, 62 N. E. 955, and similar cases, there is, of course, no room for the application of the doctrine of presumption. The real cause being shown, there is no occasion to inquire as to what the presumption would have been as to it if it had not been shown. But, if at the close of the evidence, the cause does not clearly appear, *or if there is a dispute as to what it is*, then it is open to the plaintiff to argue upon the whole evidence, and the jury are justified in relying upon presumptions, unless they are satisfied that the cause has been shown to be inconsistent with it. An unsuccessful attempt to prove by direct evidence the precise cause does not estop the plaintiff from relying upon the presumptions applicable to it.' " (Italics ours.)

See, also Cain v. So. Mass. Tele. Co., 219 Mass. 504, 505, 508, where the court said:

"We are of the opinion that the plaintiff did make out a case of specific negligence on the defendant's part. To make out a case of specific negligence it is not necessary for the plaintiff to put her hand on the specific thing which caused the accident. It is enough to make out a case of negligence (apart from questions of pleading) for the plaintiff to prove that the accident must have been caused by one or more of several things. [*James v. Boston Elevated Railway Co.*, 204 Mass. 158; *Tobin v. Pittsfield Electric Street Railway Co.*, 206 Mass. 581; *Cook v. Newhall*, 213 Mass. 392, 395.] In case the jury were not satisfied that the plaintiff was right in her contention as to the specific negligence she undertook to prove she had a right to fall back upon the doctrine of *res ipsa loquitur.*"

The rule in reference to proving specific acts of negligence, where plaintiff attempts to rely upon the *res ipsa loquitur* doctrine, is well established. The difficulty is in applying it to a given state of facts. We are of the opinion that plaintiff was entitled to the benefit of the doctrine in the submission of her case, even though her petition alleged specific acts of negligence as against the Rairdon Transfer & Warehouse Company and she introduced evidence tending to prove a great many specific acts of negligence on the part of the defendants. In this regard the record shows that the testimony of her own witnesses conflicts as to some of defendants' acts of claimed commission or omission. Some of these witnesses testified that no whistle or horn was sounding and another that a horn sounded. While there was testimony on the part of the plaintiff that there was no whistle, horn, bell or other signals given, defendants' witnesses testified, as before stated, that the bells were ringing, not only on the train, but at the crossing; that the horn on the train was being sounded and the crossing lights were flashing. Under these circumstances, there was a dispute as to what it was that defendants did or failed to do to bring about or contribute to the bringing about of the collision. There were numerous acts of negligence, of which there was evidence, which singly or concurring with each other, in whole or in part, might have brought about the collision. There was evidence of several causes of the collision, some of which may not have existed as a matter of fact. As was stated in the Cain case: "In case the jury were not satisfied that the plaintiff was right in her contention as to the specific negligence she undertook to prove she had a right to fall back upon the doctrine of *res ipsa loquitur.*"

We have examined the cases cited by the defendants, including Grimes v. Red Line Serv., Inc., 85 S. W. (2d) 767; Powell v. St. Jos. Ry. Light, Heat & Power Co., 81 S. W. (2d) 957; Sanders v. City of Carthage, 51 S. W. (2d) 529; Conduitt v. Gas & Elec. Co., 326 Mo. 133; Cook v. Union Elec. Light & Power Co., 232 S. W. 248; Glasco Elec. Co. v. Union Elec. Light & Power Co., 61 S. W. (2d) 955, and find them not in point. In most of these cases, but not in all, plaintiff's

evidence showed but one cause or..act of negligence which could possibly have brought about the injury and the court held that, having shown the exact cause, he could not rely upon the doctrine of *res ipsa loquitur*. In the case of Conduitt v. Gas & Elec. Co., *supra*, there was evidence tending to establish more than one act of negligence but the Supreme Court held that the evidence was so clear and specific in that case as to leave no doubt as to the cause of plaintiff's injury. In the case at bar there is a dispute, even in plaintiff's own testimony, as to the cause. As before stated, we do not think that any of the cases cited by the defendants are in point.

It is insisted that the court erred in not giving defendants' instruction in the nature of a demurrer to the evidence, for the reason, it is claimed, that the undisputed evidence shows that the collision was brought about, solely, by the negligence of the driver of the Rairdon Transfer & Warehouse Company truck. This contention may be somewhat inconsistent with the claim that plaintiff showed specific acts of negligence as against the present defendants but waiving that matter, we will take up the point raised.

The engineer testified that he saw the truck approaching the truck upon which his train was running and thought that it would stop before going thereon and as soon as he discovered that it was not going to stop he did all that he could to avoid the collision but was unable to do so. To use the words of the defendants in this regard: "Briefly stated, the engineer's belief that the truck would be stopped for the train was based upon these facts, as shown by the testimony quoted above: (a) The engineer's knowledge that the red flashing lights maintained at this crossing were working; (b) observing motor vehicles standing on both sides of the Frisco track as though waiting for the train to pass; (c) the very slow speed at which the truck was moving toward the track, making it possible for it to stop almost instantly."

It will be seen that defendants are relying, in part, upon their own testimony, wholly ignoring that of plaintiff. It is well established that, in considering a point of this kind, we must take the evidence in its most favorable light to the plaintiff. The driver of the truck testified that he did not see the train approaching and, as an excuse therefor, stated that his view was obstructed by the box cars of the Missouri Pacific Railroad Company and, after he passed these, by the motor vehicles passing to the south of him. However, at more than one place in his testimony he said he did not look toward the south.

We do not understand that plaintiff disputes that the driver of the truck was guilty of negligence. In fact, in her petition she alleges, as before stated, that he was guilty of negligence in failing to stop, look and listen. However, if defendants' negligence contributed to cause the collision they are liable and the jury were at liberty to

find that, had the train signaled its approach to the crossing or had the other signals thereat been working, the attention of the truck driver would have been called to his perilous situation and he would have stopped and that defendants' negligence in this regard contributed to cause the collision. Even though it could be said that the engineer had reason to believe that the driver of the truck would stop before going across the track (although, it would appear he approached the crossing going so fast that he could not have stopped in any event), still it cannot be said, as a matter of law, that he was not negligent in any respect in relying solely on the truck driver stopping. Here defendants were required to exercise the highest degree of care. There is no doubt of the negligence of the engineer, if the testimony of plaintiff's witnesses is to be believed. He had a clear view down the tracks toward the crossing and could have seen the dense traffic on both sides thereof including the truck approaching from a point approximately eighty feet east of the point of collision at a rate of speed of two and one-half to three miles per hour. He also knew, in advance, of the great amount of traffic usually at the crossing at this hour of the day, yet, notwithstanding all of this, he ran his train over the crossing at a rate of speed of forty-five miles per hour without slackening its speed or sounding any warning of his approach. The force of the collision was so great as to practically demolish the truck and a hole was torn in the corner of the train and some of the windows were broken out. There is no merit in the contention that the negligence of the truck driver, as a matter of law, was the sole proximate cause of the collision. On behalf of the plaintiff the court gave, among others, the following instructions:

"P-No. 3

"The court instructs the jury that where two or more persons are guilty of negligence which concurs in producing injury to another, then each of said parties guilty of such negligence is liable to such injured party for the full damage so caused, and said injured party may sue any one or all of such parties causing said injuries, or may settle and compromise his claim with anyone of such wrongdoers, and reserve his right to proceed against the others for the balance of the compensation he is entitled to for such injuries, if any.

"You are, therefore, instructed that the release and settlement here with the Rairdon Transfer Company do not constitute a bar to plaintiff's recovery herein, and constitutes a defense herein, only in so far as they bear on the measure of plaintiff's recovery."

"P-No. 4

"The court instructs the jury that if your verdict be for the plaintiff under the evidence and instructions of the court, then it becomes your duty to assess such damages as you find and believe from the evidence will fairly and reasonably compensate her for her injuries, if any, which you find she suffered as a direct result of the negligence

you found defendants to be guilty of under the other instructions herein; and in that connection you may consider the nature and extent of such injuries, if any, the pain which she suffered, if so, and any impairment of her ability to work and labor, if any, and such impairment and such pain as she will be reasonably certain to suffer in the future, you find, as a direct result of such injuries, if any; and after you have determined the said amount of plaintiff's compensation, *if any*, you must deduct therefrom the sum of Six Hundred Dollars ($600.00) which it is admitted plaintiff has already received from the Rairdon Transfer and Warehouse Company on account of such injuries.' Your verdict should be in one lump sum for the amount you determine plaintiff is entitled to, less said sum of Six Hundred Dollars ($600.00).'' (Italics ours.)

On behalf of the defendants the court gave the following instruction:

''The court instructs the jury that if you believe and find from the evidence that the Six Hundred Dollars, paid to the plaintiff by the Rairdon Transfer and Warehouse Company, compensated plaintiff for all the injuries, if any, you may find and believe she may have sustained, then your verdict must be in favor of the defendants, regardless of every other fact in the case.''

Complaint is made of the giving of plaintiff's Instruction P-No. 3. In this connection it is stated: ''The plain effect of the part of the instruction which told the jury an injured person 'may settle and compromise his claim with any one of such wrongdoers, and reserve his right to proceed against the others,' was to tell the jury that the appellants were 'wrongdoers' and were negligent.''

Perhaps the instruction was not as clear on this point as it should have been, but it is a well settled rule that all instructions must be read together and if, when taken and construed together, they harmonize and clearly and specifically require the finding of the essential elements, then any indefinite, ambiguous or misleading language in the particular instruction is cured. This is especially true where the instruction does not, as in this case, cover the whole case or direct a verdict. [Larey v. Mo. Kas. Tex. R. Co., 64 S. W. 681, 684; Kines v. Jamison, 277 S. W. 969, 972; Browning v. Browning, 41 S. W. (2d) 860, 869.]

Plaintiff's instruction No. 1 required the jury to find negligence on the part of the defendants before finding a verdict for the plaintiff. Several instructions were given on behalf of the defendants which told the jury in no uncertain terms that they could not find for the plaintiff if her injuries were caused solely by the negligence of the truck driver. We think the jury could not have misunderstood that part of the instruction complained of.

However, it is urged that the second paragraph of the instruction assumes not only that plaintiff was entitled to recovery but that she

should have a verdict in a sum in excess of $600. We think there is no merit in this contention. The jury, reading all of the instructions together, could not have been misled. It perhaps would have been better had this instruction made it clearer that the settlement with the Rairdon Transfer & Warehouse Company was not to be taken by the jury as any evidence that plaintiff was injured by defendants' negligence, or as to the extent of her injury, or as to the amount she was entitled to recover. While, we do not think that the instruction is a model to be followed, we are unable to see how the jury could have possibly been misled after reading all of the instructions.

Complaint is made of the giving of plaintiff's instruction P-No. 4. It is said that the last part of the instruction "tells the jury, in effect, that if their verdict is for plaintiff in any amount, it should be in excess of Six Hundred Dollars ($600.00), the amount paid to her by the Rairdon Transfer Company." We think there is no merit in this contention. The instruction tells the jury that they are to assess such damages, *if any*, as they find, from the evidence, would fairly compensate her for her injuries, if any, and, after determining said amount they should deduct the $600 she has received from the Rairdon Transfer & Warehouse Company. It is difficult to see how the jury could misunderstand what is meant by this instruction (Roman v. King, 268 S. W. 414, 418), but, if there is any ambiguity in it, it was certainly cleared up by the giving of defendants' instruction E.

It is urged that the court erred in refusing defendants' instruction F. This instruction was properly refused as it exonerated defendants if they were not negligent in running the train, wholly ignoring their possible negligence in reference to conditions at the crossing, itself.

It is also insisted that the verdict is excessive. Plaintiff's principal injury was to her spine and there is much medical testimony as to the extent of that injury. The claim of excessiveness of the verdict arises on account of the fact that plaintiff had formerly suffered from arthritis which had caused an exostosis of the first, second and third lumbar vertebrae. The exostosis is a callus bone laid down as a deposit along the vertebrae. There is evidence on the part of the plaintiff that a deposit of this character tends to cause various degrees of stiffening of the spinal column. However, there was some medical testimony on the part of the plaintiff that after the exostosis has reached a certain stage, in most cases, the patient attains a stage of "complete comfort" as far as pain is concerned. Another one of plaintiff's physicians testified that, while this condition caused a certain amount of stiffness "they get along very well, sometimes without complaint." "Q. And, of course, if a person had it in a marked degree, why, it handicaps them to a certain extent and is uncomfortable and causes pain and discomfort? A. Yes, that is quite true, although we see lots of men doing heavy work. For instance, I have seen section men that had arthritis use the shovel. Q. It is true that

one individual will go along and pay no attention to the condition he has, as far as work is concerned, while another will be completely knocked out? A. Yes, that is true.''

In this connection, plaintiff, herself, who was a domestic, testified that prior to the injury she was able to do her work without pain or trouble, even washing over a washboard; that so far as her back was concerned she was apparently well.

The evidence shows that the jerking of the train was a severe one, throwing plaintiff against the upholstered back of the seat in which she was sitting, twisting and hurting her back and causing her to faint. When she came to an ambulance was called and she was taken to the General Hospital where she stayed for a few minutes. She was then transferred to another hospital. When she arrived at the second hospital she was in a semi-conscious condition and having difficulty in breathing. Her back was very tender on her right side near the right hip. It was two or three days before she became perfectly rational and she continued to have pain in her back.

Plaintiff testified that her back pains her all of the time, both during the day and nighttime; that it hurts her most when she sits for a considerable period; that it hurts when she bends or stoops; that when she starts to turn over in the night her back hurts her so much she has to raise up to turn over, causing sleeplessness at night; that the pain is almost constant; that previous to her injury she was able to obtain employment more than half of the time, earning board and room and $2 per week; that since that time she has been unable to do any work and is permanently disabled. In 1921 she suffered from inflammatory rheumatism which, she testified, affected her only from her hips down; that the rheumatism settled in her right knee; that this knee in time became perfectly stiff; that she recovered from the rheumatism and the knee bothered her only in that it was stiff. Plaintiff had never had any serious illness in her lifetime except the rheumatism mentioned. The evidence shows that as a result of the stiffness in her knee plaintiff's right leg has become a half inch shorter. It was the opinion of the doctors that the arthritis in her vertebrae was perhaps caused by the rheumatism that settled in her knee. The X-ray picture taken after her injury disclosed that not only the exostosis had been fractured but the fracture extended through the bone, itself, that is, the superior articular process. The exostosis surrounding the process is a poor quality of bone and is not equipped with the proper circulation and does not heal like natural bone. In plaintiff's case it remains in its broken condition. The fractured exostosis was broken into little fragments, which are separated from the articular process. The exostosis is roughened at the point of the fracture and has flaky little masses apparently separated from the body of the vertebrae. As a result of the fracture of this process and the exostosis connected therewith when plaintiff moves there is a

crepitation or a grating sensation apparent to the hand at the point of the fracture. At this point nerves which go into the lower part of the body, thigh and leg come off in pairs. This fracture, with the broken and separated particles of exostosis press against and irritate these nerves and produce pain, contracting the muscles. As a result of these muscle contractions plaintiff's spine has been pulled to the left causing a scoliosis or curve to the left in the vertebrae at this point. The process no longer deflects upwardly or inwardly as it normally should, but is deflected outwardly. The shortening of plaintiff's right leg with the stiff knee tends to draw the spine to the right or bend it in the opposite way from the way it is actually bent. This somewhat counteracts the scoliosis produced by this injury, otherwise, it would be more severe. There is no known remedy by operation or otherwise to give any relief to this character of injury and the medical testimony is that it is undoubtedly permanent.

Taking the evidence in its most favorable light to plaintiff it would appear that the exostosis, before being fractured, while causing plaintiff's back to be less mobile, produced no pain and was not disabling.

In connection with the contention that the verdict is excessive, defendants call our attention to the fact that the verdict was for $4600 and when the amount of $600 paid by the Rairdon Transfer & Warehouse Company, is added, the jury necessarily found that plaintiff had suffered damages to the extent of $5200. Even so, under all of the circumstances in the case, we do not think that it was of such a size, although quite large for the injury sustained, as to warrant this court in interfering. Defendants' contention is based largely upon the claim that plaintiff's injury is caused by the arthritical condition present and not by the injury which she received in the collision. The testimony on behalf of the plaintiff is to the contrary and we must accept that testimony in disposing of this point.

The judgment is affirmed. All concur.